Luke WOODWARD, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United States Department of Labor; Straight Creek Coal Company; Liberty Mutual Insurance Company, Respondents.

No. 92–3282.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 16, 1992.

Decided April 9, 1993.

---

315

Sandra L. Mayes (argued and briefed), Appalachian Research & Defense Fund of Kentucky, Inc., Barbourville, KY, for petitioner.

John T. Chafin (argued and briefed), Francis, Kazee & Francis, Prestonsburg, KY, for respondents Straight Creek Coal Co. and Liberty Mut. Ins. Co.

Richard Zorn, Rita Roppolo (argued and briefed), U.S. Dept. of Labor, Office of the Sol., Washington, DC, for respondent Director, Office of Workers' Compensation Programs, United States Department of Labor.

Before: KEITH and JONES, Circuit Judges; and JOINER, Senior District Judge.*

KEITH, Circuit Judge.

Petitioner, Luke Woodward ("Woodward"), appeals the denial of his application for disability claims by the Benefits Review Board of the United States Department of Labor (the "Board"). Woodward filed this action pursuant to the Black Lung Benefits Act (the "Act"), 30 U.S.C. §§ 901–45. The Act provides for the payment of benefits to former coal miners who are totally disabled due to pneumoconiosis resulting from previous coal mine employment. Because the Administrative Law Judge ("ALJ") erred by excluding the early x-ray evidence and its attendant interpretations from review, we **REVERSE** the Board's affirmance of the ALJ's denial of disability benefits and **REMAND** the case to the ALJ for further proceedings consistent with this opinion.

## I.

Woodward was born on May 7, 1936. He contends that he worked as a coal miner

---

* The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

for approximately eighteen years (1956–1975) and that he has worked in no other industry. Woodward specifically asserts, contrary to his social security earnings record, that he worked for Straight Creek Coal Company ("Straight Creek")[1] from 1958–1975 and was otherwise self-employed from 1962–64.[2] Earnest Woodward, the owner of Straight Creek, testified before the ALJ that Woodward had worked continuously for his company from 1957 through 1975 at various mines. The ALJ, however, found that Woodward only worked in the coal mining industry for eleven and one-half years for purposes of the Act. *See* 30 U.S.C. § 902(d).[3]

Woodward filed a claim for black lung benefits with the Department of Labor on December 13, 1978. The Department of Labor denied his claim but notified Straight Creek that, should benefits ultimately be awarded, Straight Creek was potentially liable. Woodward requested a formal hearing before an ALJ on February 9, 1988.

On March 30, 1988, the administrative hearing took place. The ALJ was presented with volumes of x-ray evidence. There were eight different X-rays in the record with a total of thirty-eight (38) interpretations. The following table sets out the x-ray evidence presented to the court.

| DATE OF READING | MEDICAL DOCTOR/ QUALIFICATION[4] | QUALITY OF X-RAY | EXHIBIT NO. | RESULT |
|---|---|---|---|---|
| | November 12, 1975 X–RAY | | | |
| 11–12–75 | Anderson/** | – | DX 16 | 1/1 |
| 11–12–75 | Penman/** | – | DX 16 | 1/1 |
| | February 12, 1979 X–RAY | | | |
| 2–23–79 | Siddiqui/** | 1 | DX 12 | 1/1 |
| 5–30–79 | Spitz/B & Bd Cert | 2 | DX 11 | Neg. |

1. The "Decision and Order—Denying Benefits" refers to respondent as "Straight Creek Coal Company" while the respondent refers to itself as "Straight Ridge Coal Company." Consistent with the Benefits Review Board decision, this opinion will refer to the respondent as "Straight Creek."

2. According to his social security earning records, Woodward worked for several non-coal mine employers, including Kroger Company, Rose Brothers Company of Cincinnati, A B Newton and Company, Geier Industries, Inc., Miami County Broadcasting Company, Inc., and True Wall, Inc. The social security records also indicate that he worked for several coal companies.

3. The ALJ found the following:
[T]he evidence supports a finding that the claimant (Woodward) began working as a miner ... in the last quarter of 1958.
The claimant remained employed as a coal miner until 1973 when his health prevented him from doing his usual work. After 1972, he worked only part-time in the mines. Prior to 1972 and after 1958, the claimant worked as a transportation worker hauling coal from the mine to the tipple. He performed construction and maintenance work in or around the coal mines. He also worked digging coal.

. . . . .

Therefore, I find the claimant worked 11-½ years at coal mine employment.

4. The qualifications for x-ray readers are as follows:

An "A" reader is a physician who is qualified to read X-rays for pneumoconiosis.
A "B" reader is a physician who has demonstrated a proficiency in assessing and classifying X-ray evidence of pneumoconiosis by successfully completing an examination conducted by or on behalf of the Department of Health and Human Services. *See Mullins v. Director, OWCP*, 484 U.S. 135, 145 n. 16 (1987).
The classification, Board Certified ("Bd Cert"), refers to those physicians who have been certified by either the American Board of Radiology, Inc. or the American Osteopathic Association. *See* 20 C.F.R. § 718.-202(a)(1)(ii)(C) and (D).
The ALJ correctly noted:
In evaluating x-ray evidence for purposes of determining the existence or nonexistence of pneumoconiosis, more weight may be given to the interpretations of B-readers because of their expertise in this area. Additionally, more weight may be given to radiologists with qualifications of a B-reader and board certification than those of a B-reader. Also, the Sixth Circuit Court of Appeals has taken judicial notice of the fact that board certified radiologists have comparable qualifications to B-readers. (citations omitted).

### January 28, 1980 X–RAY

| | | | | |
|---|---|---|---|---|
| 1–29–80 | Bushey/A | – | DX 17 | 2/1 |

### September 9, 1985 X–RAY

| | | | | |
|---|---|---|---|---|
| 9–09–85 | Baker/A | 1 | DX 29 | 1/0 |
| 9–24–85 | Elmer/B & Bd Cert | 1 | DX 30 | Neg. |
| 7–21–87 | Stokes/Bd Cert | – | CX 4 | 1/1 |
| 8–11–87 | Bassali/B & Bd Cert | 1 | CX 8 | 1/0 |

### November 12, 1985 X–RAY

| | | | | |
|---|---|---|---|---|
| 11–12–85 | Broudy/B | 1 | EX 3 | Neg. |
| 11–15–85 | O'Neill/B | 1 | EX 3 | Neg. |
| 11–20–85 | Quillin/B & Bd Cert | 1 | EX 2 | Neg. |
| 3–28–86 | Broudy/B | 1 | EX 4 | Neg. |
| 4–03–86 | Quillin/B & Bd Cert | 1 | EX 4 | Neg. |
| 4–10–86 | Swann/B | 1 | EX 4 | Neg. |
| 7–21–87 | Stokes/Bd Cert | – | CX 4 | 1/1 |
| 7–28–87 | Nichols/B | 1 | EX 8 | Neg. |
| 7–29–87 | Wershba/B | 1 | EX 8 | Neg. |
| 7–31–87 | Halbert/B & Bd Cert | 1 | EX 9 | Neg. |
| 8–12–87 | Bassali/B & Bd Cert | 1 | CX 7 | 1/0 |
| 9–9–87 | Nichols/B | 2 | EX 13 | Neg. |
| 9–9–87 | Gogineni/B | 2 | EX 13 | Neg. |
| 9–10–87 | Duncan/B | 2 | EX 13 | Neg. |
| 9–21–87 | Binns/B | 2 | EX 13 | Neg. |
| 9–25–87 | Wershba/B | 2 | EX 13 | Neg. |

### August 3, 1987 X–RAY

| | | | | |
|---|---|---|---|---|
| 8–18–87 | Bassali/B & Bd Cert | 1 | CX 3 | 1/1 |

### August 14, 1987 X–RAY

| | | | | |
|---|---|---|---|---|
| 8–15–87 | Dahhan/B | 1 | EX 10 | Neg. |
| 1–7–88 | Broudy/B | 1 | EX 14 | Neg. |
| 1–15–88 | Jarboe/B & Bd Cert | 1 | EX 15 | Neg. |
| 1–22–88 | Halbert/B & Bd Cert | 2 | EX 16 | Neg. |
| 1–28–88 | Lane/B | 1 | EX 17 | Neg. |
| 2–4–88 | Duncan/B | 1 | EX 18 | Neg. |

### September 29, 1987 X–RAY

| | | | | |
|---|---|---|---|---|
| 10–19–87 | Clarke/A | 1 | CX 2 | 1/1 |
| 11–23–87 | Brandon/B & Bd Cert | 2 | CX 1 | 1/0 |
| 3–4–88 | Duncan/B | – | EX 20 | Neg. |
| 3–6–88 | Nichols/B | – | EX 20 | Neg. |
| 3–8–88 | Binns/B | – | EX 20 | Neg. |
| 3–8–88 | Wershba/B | – | EX 20 | Neg. |

---

On January 29, 1989, the ALJ issued his decision denying benefits. The ALJ's review was limited to the readings of the five most recent X-rays. He specifically noted that he would not consider the three earlier X-rays, which had all been read positive for pneumoconiosis "since pneumoconiosis is a progressive disease, (and in light of this,) more weight may be afforded the more recent X-rays." He found that the last five X-rays indicated that Woodward did not suffer from pneumoconiosis, and that there was insufficient evidence to establish the existence of a totally disabling respiratory condition. The ALJ then denied Woodward's claim for benefits, holding that Woodward was not entitled to the rebuttable presumption of entitlement found in 20 C.F.R. § 727.203(a)(1) based upon the chest X-rays.

Woodward appealed to the Benefits Review Board challenging the ALJ's failure to invoke the interim presumption of entitlement and his evaluation of the evidence. The Board affirmed the ALJ's denial of benefits stating that it was within the ALJ's discretion to give weight only to the readings of the most recent X-rays. This timely appeal followed.

## II.

This Court's review of a Benefits Review Board decision is very narrow. *Director, OWCP v. Quarto Mining Co.*, 901 F.2d 532, 536 (6th Cir.1990). In the course of administrative proceedings, the ALJ hears the evidence and makes findings of fact. The Benefits Review Board must sustain these findings if they are supported by substantial evidence in the record considered as a whole and are in accordance with the law. *See Quarto Mining*, 901 F.2d at 536 (citing *Pyro Mining Co. v. Slaton*, 879 F.2d 187 (6th Cir.1989)). Substantial evidence is defined as "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ramey v. Kentland–Elkhorn Coal Corp.*, 755 F.2d 485, 488 (6th Cir.1985). This court must scrutinize the Board's application of the substantial evidence standard and correct any errors of law. *See Director, OWCP v. Rowe*, 710 F.2d 251, 254 (6th Cir.1983).

On appeal, Woodward challenges the ALJ's determination that he was not entitled to invoke the interim presumption of disability based upon the x-ray evidence and the ALJ's exclusive use of the last five X-rays in determining that he was not entitled to disability benefits for pneumoconiosis. Each claim is addressed seriatim below.

### A.

Woodward first asserts that he was entitled to the interim presumption of disability as defined in the Code of Federal Regulations. 20 C.F.R. § 727.203 states in pertinent part:

**Interim presumption.**

(a) *Establishing interim presumption.* A miner who engaged in coal mine employment for at least 10 years will be presumed to be totally disabled due to pneumoconiosis, or to have been totally disabled due to pneumoconiosis at the time of death, or death will be presumed to be due to pneumoconiosis, arising out of that employment, if one of the following medical requirements is met:

(1) *A chest roentgenogram (X-ray) biopsy, or autopsy establishes the existence of pneumoconiosis* ...;

(2) Ventilatory studies establish the presence of a chronic respiratory or pulmonary disease ...;

(3) Blood gas studies which demonstrate the presence of an impairment in the transfer of oxygen from the lung alveoli to the blood ...;

(4) Other medical evidence, including the documented opinion of a physician exercising reasoned medical judgment, establishes the presence of a totally disabling respiratory or pulmonary impairment;

....

(b) *Rebuttal of interim presumption.* In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:

(1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work ...; or

(2) In light of all relevant evidence it is established that the individual is able to do his usual coal mine work or comparable and gainful work ...; or

(3) The evidence establishes that the total disability or death of the miner did not arise in whole or in part out of coal mine employment; or

(4) *The evidence establishes that the miner does not, or did not, have pneumoconiosis* (emphasis added).

The Supreme Court stated in *Mullins Coal Co. v. Director, OWCP*, 484 U.S. 135, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987) that a black lung claimant must establish

at least one of the qualifying facts in 20 C.F.R. § 727.203(a) by a preponderance of the evidence. *See id.* at 141–43, 146–61, 108 S.Ct. at 431–32, 435–41. The evidence presented to the ALJ consisted of the eight X-rays and their respective readings. Based on his evaluation of the x-ray evidence, however, the ALJ found "that the weight of the readings of the five X-rays taken since September 9, 1985 fails to prove the existence of pneumoconiosis." Thus, whether Woodward is entitled to the interim presumption is dependent upon whether the ALJ properly evaluated the evidence. *See Fife v. Director, OWCP,* 888 F.2d 365, 368 (6th Cir.1989) ("This presumption is invoked when the preponderance of the x-ray evidence in the record establishes the presence of pneumoconiosis."). *See also Orange v. Island Creek Coal Co.,* 786 F.2d 724, 725 (6th Cir.1986) ("[T]he requirements of the Board are now that *all* relevant documented medical opinions must be considered in determining whether the presumption under Section 727.203(a)(4) should be invoked.")

**B.**

Woodward primarily contends that the ALJ improperly weighed the evidence in this case. At the outset, the ALJ limited his review of the x-ray evidence to the last five X-rays taken. The ALJ stated:

I initially note the record contains 38 readings of 8 X-rays. However, it is well established that since pneumoconiosis is a progressive disease, more weight may be afforded the more recent X-rays. *Stanford v. Director, OWCP,* 7 BLR 1–541, 1–5432 (1984) (sic). For this reason, I will limit my review of the x-ray evidence to the readings of those five X-rays taken on or after September 9, 1985.

This approach is commonly referred to as the "later evidence" rule. *See Mullins Coal Company v. Director, OWCP,* 484 U.S. 135, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987); *Adkins v. Director, OWCP,* 958 F.2d 49 (4th Cir.1992); *Rochester & Pittsburgh Coal Co. v. Krecota,* 868 F.2d 600, 602 (3d Cir.1989); *Consolidation Coal Company v. Chubb,* 741 F.2d 968, 973 (7th Cir.1984). This rule, however, has generally been invoked to credit more recent positive study results over earlier negative results, in light of the known progressive nature of pneumoconiosis.

The Fourth Circuit in *Adkins v. Director, OWCP,* 958 F.2d 49 (4th Cir.1992), fleshed out the parameters of this principle. In *Adkins,* a physician interpreted an early X-ray as positive for complicated pneumoconiosis. Subsequent physicians, however, held that later films were positive only for simple pneumoconiosis. In reversing the denial of benefits, the Fourth Circuit noted:

In a nutshell, the theory is: (1) pneumoconiosis is a progressive disease; (2) therefore, claimants cannot get better; (3) therefore, a later test or exam is a more reliable indicator of the miner's condition than an earlier one.

This logic only holds where the evidence is consistent with premises (1) and (2) -i.e., the evidence, on its face, shows that the miner's condition has worsened. In that situation, it is possible to reconcile the pieces of proof. All may be reliable; they do not necessarily conflict, though they reach different conclusions. All other considerations aside, the later evidence is more likely to show the miner's current condition.

On the other hand, if the evidence, taken at face value, shows that the miner has improved, the "reasoning" simply cannot apply. *It is impossible to reconcile the evidence.* Either the earlier or the later result *must* be wrong, and it is just as likely that the later evidence is faulty as the earlier. The reliability of irreconcilable items of evidence must therefore be evaluated without reference to their chronological relationship.

*Adkins,* 958 F.2d at 51–52 (emphasis in original and footnote omitted). Moreover, in *Mullins Coal Co. v. Director, OWCP,* 484 U.S. 135, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987), the Supreme Court also cautioned that although "early negative x-ray readings are not inconsistent with significantly later positive readings ..., [t]his proposition is not applicable where the factual

pattern is reversed." *Id.* at 151, 108 S.Ct. at 436 (emphasis added).

In *Conn v. White Deer Coal Co.*, 862 F.2d 591 (6th Cir.1988), this Court was faced with contradictory x-ray evidence. We affirmed the ALJ's denial of benefits stating:

> [T]he ALJ considered a number of x-ray readings, and gave more weight to those by "B" readers, the majority of which were negative, and to interpretations of most recent x-rays, both of which were negative. He also credited the findings of Dr. Wright and Dr. Cornish, both examining physicians, that Conn did not have pneumoconiosis. The ALJ's method of evaluating the x-ray evidence for § 727.203(b)(4) rebuttal was upheld in *Orange v. Island Creek Coal Co.*, 786 F.2d 724 (6th Cir.1986). Further, the ALJ's method of weighing evidence is supported by our reading of *Mullins.*

*Id.* at 597. In *Orange v. Island Creek Coal Co.*, 786 F.2d 724 (6th Cir.1986), this Court affirmed an ALJ's denial of black lung benefits. As in this case, the ALJ was presented with earlier positive readings and later negative readings. The ALJ evaluated all of the evidence and resolved the conflict, however, by differentiating between the qualifications of the x-ray readers and noting the progressive nature of the disease.

■ In this case, the ALJ simply misapplied the "later evidence" principle. The ALJ did not weigh the results of the earlier against the later X-rays, as argued by Straight Creek. The ALJ explicitly stated that he was limiting his consideration to the latter five X-rays and proceeded to weigh the results of those x-ray interpretations. It was within this limited scope of reference that the ALJ found that the x-ray interpretations were overwhelmingly negative. Moreover, the positive results from the first three X-rays *were not reconciled* with the negative interpretations of the last five X-rays. The ALJ's analysis clearly

runs counter to our decision in *Conn v. White Deer Coal Co.* and the Fourth Circuit's rationale in *Adkins.* Pneumoconiosis is a progressive and degenerative disease. The subsequent negative x-ray readings do not illustrate the expected deterioration in the miner's condition, but rather an improvement in his physical condition, which is inconsistent with the normal course of the disease. Thus, a disharmony in the x-ray evidence exists, and the ALJ must specifically resolve that conflict. Accordingly, the ALJ misapplied the later evidence rule and erred as a matter of law.[5]

This case stands in contrast to the actual facts of *Adkins.* The ALJ in *Adkins* was called upon to determine the severity of the pneumoconiosis. In this case, the ALJ was called upon to determine whether Woodward suffered from pneumoconiosis, at all. The Supreme Court has stated that the Black Lung Benefits "Act embodies the principle that doubt is to be resolved in favor of the claimant." *Mullins Coal Co. v. Director, OWCP*, 484 U.S. 135, 156, 108 S.Ct. 427, 439, 98 L.Ed.2d 450 (1987). Accordingly, if the X-rays that showed the existence of pneumoconiosis are credited, then Woodward has indeed stated a prima facie case for the invocation of the interim presumption of disability. That case may be effectively rebutted, however, if the ALJ, after properly weighing the evidence, determines that Woodward does not suffer from pneumoconiosis.

## C.

■ The Court recognizes that in the instant case, the ALJ was presented with the complicated process of evaluating cumulative evidence. In this case, both sides hired experts to read the eight chest X-rays at issue. Almost as a matter of course, each of these *objective* medical experts evaluated these X-rays to favor the party that hired him. Straight Creek hired many more experts than Woodward, and some of these experts read the same X-ray numerous times. From the evidence presented,

---

5. We also note that the Department of Labor has also taken this position in its appellate brief and at oral argument for this case.

the ALJ concluded: "I find that the most one could conclude from these voluminous readings is that they present an equivocal picture as to whether the claimant is afflicted with the disease and clearly do not meet the claimant's burden of proof. Thus, I find the interim presumption is not invoked...."

At first blush, it may appear that the sheer quantity of x-ray readings should directly bear on evaluation of the evidence. In *Fife v. Director, OWCP*, 888 F.2d 365 (6th Cir.1989), this Court appeared to sanction the wholesale practice of numerical counting when it was faced with seven varying interpretations of three chest X-rays. *Id.* at 368 ("Given that the negative readings outnumbered the positive and one of them was by a B-reader, we conclude that substantial evidence supports the decision of the ALJ."). This Court, however, has recognized the need for qualitative evaluation of the x-ray evidence, as well. *See id.* (noting the qualifications of the expert readers and their qualitative evaluations of the x-rays).

Straight Creek cites two cases for the proposition that numerical weight is a factor upon which the ALJ may rely. *See Trent v. Director, OWCP*, 11 BLR 1–26 (1987); *Sheckler v. Clinchfield Coal Co.*, 7 BLR 1–128 (1984). The ALJ, however, is restricted by statute in his or her consideration of such cumulative evidence. The Administrative Procedure Act, 5 U.S.C. §§ 551–576, which is applicable to Black Lung Act claims pursuant to 20 C.F.R. § 725.452, provides that evidence "required for a full and true disclosure of the facts" must be admitted. 5 U.S.C. § 556(d). The agency, "as a matter of policy *shall* provide for the *exclusion* of irrelevant, immaterial, or *unduly repetitious* evidence." *Id.* (emphasis added). The ALJ must review the presentation of evidence on a case-by-case basis.

█ In the case at bar, we believe that the ALJ erred by considering "unduly repetitious" evidence surrounding the X-rays taken in this case. For example, the ALJ considered sixteen readings of the November 12, 1985, X-ray—two by Woodward's "experts" and fourteen by Straight Creek's "experts." We note that both parties enlisted the services of "Board Certified" and "B" readers to evaluate the X-rays. Administrative factfinders simply cannot consider the quantity of evidence alone, without reference to a difference in the qualifications of the readers or without an examination of the party affiliation of the experts. In other words, consideration of merely quantitative differences, without an attendant qualitative evaluation of the x-rays and their readers, is legal error. *See Fife*, 888 F.2d at 368.

This cumulative evidence inquiry also reveals certain policy flaws in the adjudication of claims that typically operate to disadvantage Black Lung Benefits Act claimants. First, experts hired exclusively by either party tend to obfuscate rather than facilitate a true evaluation of a claimant's case. Second, when one party is able to hire significantly more experts because it has infinitely more resources, the truth-seeking function of the administrative proceeding is skewed and directly undermined. Third, hiring armies of experts often results in needless expense. If such a system continues unchecked, justice will not be served, while moneyed interests thrive.

At the administrative level, the factfinding process should not be so arduous. While the parties certainly have the right to present evidence to defend or support their respective claims, the ALJ must be vested with the discretion to limit the impact of voluminous, duplicative evidence. In exercising this discretion, the ALJ may wish to have the parties agree upon a predetermined number of experts to qualitatively evaluate the X-rays taken, while sharing the costs of hiring them. Such a procedure would likely increase fairness and reduce attendant costs.

## III.

For the foregoing reasons, we **REVERSE** the Board's affirmance of the ALJ's denial of disability benefits and **RE-**

**MAND** the case to the ALJ for further proceedings consistent with this opinion.